UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARY GARDEN **Garden,** v. VITAS HEALTHCARE CORPORATION, VITAS HEALTHCARE CORPORATION, ATLANTIC, et al. **Defendants.** | Civil Action No. 15-00611-BRM-TJB **OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Vitas Healthcare Corporation and Vitas Healthcare Corporation Atlantic's ("Vitas") Motion for Summary Judgment (ECF No. 27) and Mary Garden's ("Garden") Motion for Partial Summary Judgment on the issue of New Jersey Law Against Discrimination ("NJLAD") liability. (ECF No. 29). Garden opposed Vitas' Motion for Summary Judgment (ECF No. 29-1) and Vitas opposed Garden's Motion for Partial Summary Judgment. (ECF No. 35). Having reviewed the submissions filed in connection with the motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause shown, Vitas' Motion for Summary Judgment is **GRANTED** and Garden's Motion for Partial Summary Judgment is **DENIED**.

**I. PROCEDURAL HISTORY**

On November 10, 2014, Garden filed a Complaint against Vitas in the Superior Court of New Jersey, Ocean County alleging a violation of the NJLAD, N.J.S.A. 10:5-1, *et seq.*. (ECF No. 1-1.) On January 29, 2015, Vitas removed this action to the United States District Court, District

1

of New Jersey, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. (ECF. No. 1.) On February 25, 2015, Garden filed an Amended Complaint against Vitas, which included additional factual averments. (ECF No. 3.) On March 31, 2015, Vitas filed an Answer to the Garden's Amended Complaint, denying Garden's allegations and raising several affirmative defenses. (ECF No. 7.) On April 8, 2015, Garden filed a Second Amended Complaint for the limited purpose of correcting the caption. (ECF No. 9.)[1]

On March 23, 2018, Vitas filed a Motion for Summary Judgment. (ECF No. 27.) On April 23, 2018, Garden filed an Opposition to Vitas' Motion for Summary Judgment together with its Cross-Motion for Partial Summary Judgment. (ECF No. 29.) On May 7, 2018, Vitas filed a Reply Brief in further support of its Motion for Summary Judgment and in opposition to Garden's Cross-Motion for Summary Judgment. (ECF No. 35.)

## II. FACTUAL BACKGROUND

Vitas is the nation's largest provider of end-of-life, or "hospice" care, providing high quality human services, products, and case management to terminally ill and other appropriate patients and their families. (ECF No. 27-2 ¶ 1; ECF No. 29-2 ¶ 1.) On September 18, 2006, Garden was hired as a Vitas Representative in its Jersey Shore Program. (ECF No. 27-2 ¶ 2; ECF No. 29-2 ¶ 2.) On November 1, 2013, Garden's employment with Vitas was terminated. (ECF No. 27-2 ¶ 3; ECF No. 29-2 ¶ 3.) On her date of hire at Vitas, Garden was 39 years old, and on her date of termination, Garden was 46 years old. (ECF No. 27-2 ¶ 4; ECF No. 29-2 ¶ 4.)

A Vitas Representative is a sales professional whose primary function is to obtain patient referrals from various sources which result in the admission of patients to the program. (ECF No.

---

[1] The parties agree that the Second Amended Complaint (ECF No. 9) did not alter the Complaint substantively, but merely corrected the caption. As such, Defendants did not file a second answer.

27-2 ¶ 11; ECF No. 29-2 ¶ 11.) Each Vitas Representative was assigned a certain goal or quota for admissions each quarter. (ECF No. 27-2 ¶ 12; ECF No. 29-2 ¶ 12.) From December 29, 2010 to April 25, 2013, Garden reported directly to the Director of Marketing and Development ("DMD"), Raymond LeFante ("LeFante"). (ECF No. 27-2 ¶ 13; ECF No. 29-2 ¶ 13.) LeFante reported directly to the General Manager of the Jersey Shore Program ("GM"), Susan Bell ("Bell"). (*Id.*) Bell was the GM from 2012 through the termination of Garden's employment with Vitas. (*Id.*)

Garden's starting salary was $65,000 annually. (ECF No. 27-2 ¶ 5; ECF No. 29-2 ¶ 5.) At the time of her termination, Garden's salary was $72,906. (ECF No. 27-2 ¶ 6; ECF No. 29-2 ¶ 6.) Vitas Representatives are eligible to earn commissions, with the same overall commission structure being applied to all Representatives. (ECF No. 27-2 ¶ 7; ECF No. 29-2 ¶ 7.) Commission payments are based primarily on the achievement of "admission goals." (*Id.*) Under the commission structure, newly hired representatives do not immediately earn commissions. (ECF No. 27-2 ¶ 8; ECF No. 29-2 ¶ 8.) In addition to base salary and commissions, Vitas Representatives are eligible to earn "milestones," payments based on admissions over a longer period of time. (ECF No. 27-2 ¶ 9; ECF No. 29-2 ¶ 9.) Vitas Representatives were also provided various fringe benefits, many of which were not available to newly hired representatives. (ECF No. 27-2 ¶ 10; ECF No. 29-2 ¶ 10.)

Vitas conducts annual performance evaluations of its sales representatives, grading the representatives on a scale of zero to three. (ECF No. 27-2 ¶ 14; ECF No. 29-2 ¶ 14.) A score of 2.7-3.0 indicates that the sales representative exceeded performance expectations, a score of 2.0-2.6 indicates that the sales representative achieved performance expectations, a score of 1.6-1.9 indicates that the sales representative partially achieved performance expectations, and a score below 1.6 indicates that the sales representation did not meet performance expectations. (*Id.*) In

her first year of employment with Vitas, Garden received a 2.8 performance rating. (ECF No. 27-2 ¶ 15; ECF No. 29-2 ¶ 15.) In 2008, Garden achieved 95% of her admissions goal, but did not receive a numerical rating. (ECF No. 27-2 ¶ 16; ECF No. 29-2 ¶ 16.) In 2009, Garden received a performance rating of 2.0, and in 2010, Garden received a performance rating of 2.1. (ECF No. 27-2 ¶¶ 17, 18; ECF No. 29-2 ¶¶ 17, 18.) In 2011, Garden received a rating of 1.61 from LeFante, with her admission percentage dropping to 77.7%. (ECF No. 27-2 ¶ 19; ECF No. 29-3, Ex. C, at 89:23-90:13.) In 2012, Garden received a rating of 1.47 from LeFante, with her admission percentage dropping to 70%. (ECF No. 27-2 ¶ 20; ECF No. 29-3, Ex. C, at 95:7-97:1.) Garden contends that the drop in her production in 2011 was caused by a split in her territory and Vitas' acquisition of additional representatives (ECF No. 29-3, Ex. C, at 89:23-91:5), and that the drop in her production in 2012 was due to her "loss of key accounts due to issues beyond her control." (ECF No. 29-3, Ex. C, at 95:7-96:6).

Vitas completed a Request for Personnel Action form concerning the Garden's termination, which lists "Poor Performance" as the grounds for termination. (ECF No. 27-2 ¶ 22; ECF No. 29-2 ¶ 22.) Vitas also prepared a Termination Memo, dated October 31, 2013, outlining the reasons for Garden's dismissal, which stated:

> Due to continued issues with [Garden]'s job performance the decision was made to terminate her employment. Below is a description of the performance issues:
>
> On June 7, 2013, [Garden] was issued a Written Warning for failing to meet performance expectations. From January 2013 – May 2013, [Garden] failed to achieve her goals for the previous five months and was below 80%, 4 of the 5 months.
>
> On August 20, 2013, [Garden] was issued a Final Written Warning for failing to meet performance expectations. For the months June and July 2013, [Garden] achieved no admissions during these two months. In addition, on the date the warning was issued she was tracking to achieve zero admissions for the month of August. Also

cited in the Final Written Warning was that [Garden] failed to return phone calls from referral sources, co-workers and management to communicate important information to her. The warning gave [Garden] specific examples of how to grow existing referrals and was also instructed that on every Monday she was to send the General Manager (GM) a listing of her scheduled appointments. Additionally, the Warning also addressed that [Garden] was averaging just 4 calls per day instead of the required 10-15 calls per day. [Garden] was not fulfilling her job responsibilities of making the expected calls and generating referrals.

Since her Final Warning the following performance issues have occurred:

To date for the month of October [Garden] has achieved 5 admissions for the month of October.

[Garden] continues to not make her required minimum of 10 completed calls per day. For the month of August, she averaged 5.7 calls per day and for the month of September, she averaged 3.3 calls per day and as of Oct 30th [Garden] has averaged just $\underline{5}$ sales calls per day.

[Garden] continues not to pre-populate her sales force calendar as of October 30, 2013 she had only 5 sales calls scheduled through November 15, 2013.

[Garden] failed to send the GM the list of scheduled appointments and call objectives, on a weekly basis, as requested on the Final Written Warning. [Garden] did not follow the directive her GM had given her.

On September 12th, [Garden] was notified that the scheduled appointment for the Veterans Liaison and physician was cancelled. Although [Garden] was aware of this the day prior to the event, it was not communicated to the Veterans Liaison and he travelled to the facility expecting the meeting to occur.

As a result of the above occurrences and her failure to carry out her job responsibilities and directives the decision was made to terminate [Garden]'s employment effective November 1, 2013, [Garden] was notified of this decision on October 31, 2013.

(ECF No. 27-4, Ex. D, at 17-18.)

Garden rebutted Vitas' contentions only with her own deposition testimony. Specifically,

Garden testified:

> I was the most seasoned rep there. I was certainly there the longest.
>
> I was probably making the most, and I was up for milestones, which were significant that I was going to be approaching, and now it seemed like they were hiring younger, less experienced reps.
>
> . . .
>
> It is just my opinion that I was there longer, I was the more seasoned rep.
>
> The program wasn't doing well. I was not a success. They wanted to cut the team, and why not start with the oldest rep there, and they were hiring younger, less experienced for less money. They didn't have to do commissions or benefits right off the bat, they restructured the territory.
>
> . . .
>
> I do not know for a fact [that I was making the most money of all the representatives] but I was there the longest, and I was definitely making a nice salary.

(ECF No. 29-3, Ex. C, at 219:5-221:5.)

Garden further testified that Vitas Representatives who met "double digit" monthly admission goals earned a higher commission than those who had single digit monthly goals. (ECF No. 29-3, Ex. C, at 224:2-18.) Garden claimed that newer representatives were not able to earn a commission until a designated waiting period but provided no evidence to this effect, whereas she, as an experienced representative, would have been eligible for a $10,000 "milestone" with 1,000 admissions. (ECF No. 29-3, Exhibit C, at 221:9-224:18.) Finally, Garden conceded she was not aware of any other facts supporting her age discrimination claim other than those to which she testified, noting "[t]hat is really just it." (ECF No. 29-3, Ex. C, at 225:25-226:3.) At the time of Garden's termination, there were several Vitas Representatives close to her in age, as well as one representative who was approximately twenty years older than Garden. (ECF No. 27-4, Ex. M, at

76-78.)

### III. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3rd Cir. 1991) (citing *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.), *cert. denied*, 474 U.S. 1010 (1985)); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party bears the burden of persuasion at trial, summary judgment is appropriate only if the evidence is not susceptible to

different interpretations or inferences by the trier of fact. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex*, 477 U.S. at 330 (Brennan, J., dissenting). Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## IV. DECISION

The NJLAD prohibits age-based discrimination in employment decisions, stating in pertinent part:

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination: . . . [f]or an employer, because of the race, creed, color, national origin, ancestry, *age* . . . to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . .

N.J.S.A. 10:5-12(a) (emphasis added).

In order to assert a successful termination claim under the NJLAD, a plaintiff has the burden of proving, by a preponderance of the evidence: (1) the plaintiff belongs to a protected class; (2) the plaintiff was performing adequately in his or her position; (3) the plaintiff was terminated; and (4) the employer replaced, or sought to replace, the plaintiff with a candidate "sufficiently younger to permit an inference of age discrimination." *Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1145 (N.J. 2005); *Bergen Commer. Bank v. Sisler*, 723 A.2d 944, 959 (N.J. 1999). If the employer "proffers a non-discriminatory reason [for the termination], the plaintiff does not qualify for a jury trial unless he or she can 'point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Zive*, 867 A.2d at 1144 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). The non-moving party must then "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' *Ezold* [*v. Wolf, Block, Schorr & Solis-Cohen*, 983

F.2d 509, 531 (3d Cir. 1992)] and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Fuentes*, 32 F.3d at 765 (quoting *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993)).

Additionally, it is well settled that state and federal courts interpreting the NJLAD look to federal law for guidance, specifically Title VII and the Age Discrimination in Employment Act of 1967 ("ADEA"). *See Grigoletti v. Ortho Pharm. Corp.*, 570 A.2d 903, 911 (N.J. 1990) (holding that, when construing the terms of the NJLAD, courts frequently look to federal precedent governing Title VII of the Civil Rights Act of 1964 as a "key source of interpretive authority," and that substantive and procedural standards developed under the NJLAD "have been markedly influenced by the federal experience"); *see also Sisler*, 723 A.2d at 949 (holding that when interpreting the NJLAD, New Jersey courts should look to federal cases arising under analogous provisions of Title VII of the Civil Rights Act of 1964 as well as the ADEA); *see also Shaner v. Horizon Bancorp.*, 561 A.2d 1130, 1133 (N.J. 1989) (approving of the use of "federal anti-discrimination statutes" in general, and Title VII in particular, when interpreting the NJLAD in an age-discrimination case); *see also Mancuso v. City of Atlantic City*, 193 F. Supp. 2d 789, 798 (D.N.J. 2002). The Third Circuit has explicitly held that federal jurisprudence interpreting the ADEA, specifically *Hazen Paper v. Biggins*, 507 U.S. 604 (1993), applies to NJLAD cases. *Kelly v. Moser*, 348 F. App'x 746, 747 n.2 (3d Cir. 2009). Accordingly, this Court will look to federal case law concerning the ADEA and other analogous statutes containing anti-discrimination provisions for guidance.

In interpreting the elements of an age discrimination suit under federal law, courts have made it exceedingly clear that age *must* be the but-for cause of the employer's adverse action. *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 171 (2009) (holding that a plaintiff bringing an

ADEA claim "must prove, by a preponderance of the evidence, that age was the but-for cause of the challenged adverse employment action" and that the "burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one of the motivating factors"); *see also Hazen Paper*, 507 U.S. at 609-10 (holding that in a disparate treatment case, there can be no liability unless the employer's protected trait, age, had a determinative influence on the negative employment decision).

Here, Garden has not offered any evidence in support of her claim other than the bald assertions in her own deposition testimony. Garden's deposition testimony is insufficient to create a material issue of fact necessitating a jury trial. Although "there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion," *Weldon v. Kraft, Inc.*, 893 F.2d 793, 800 (3d Cir. 1990), such evidence must be accompanied by circumstantial evidence demonstrating that discrimination was the but-for cause of the defendant's action. *See Jackson v. Univ. of Pittsburgh*, 826 F.2d 230, 236 (3d Cir. 1987). The claims raised by Garden in her deposition are based entirely upon speculation and do not constitute *prima facie* evidence of conduct violative of the NJLAD. Garden testified, *inter alia*, that she was the "most seasoned" Vitas Representative and Vitas avoided awarding her a $10,000 milestone and a double-digit commission by terminating her and hiring new employees who would not be eligible for such benefits. (ECF No. 29-3, Ex. C, at 219:5-222:1.) However, Garden concedes Vitas' motivation in terminating her may have been cost-driven rather than age-driven, noting that Vitas "wanted to cut the team" because the program "wasn't doing well" and "was not a success." (ECF No. 29-3, Ex. C, at 220:19-20.)

Even if Garden's assertions are true, she has still failed to establish a *prima facie* claim of age discrimination under the NJLAD. In *Hazen Paper*, the Supreme Court rejected a plaintiff's theory that his discharge violated the ADEA as the employer was motivated by preventing his pension from vesting, remarking that there is "no disparate treatment under the ADEA when the motivating factor is . . . some feature other than the employee's age." *Hazen Paper*, 507 U.S. at 609. The Third Circuit has reaffirmed this holding, noting, "[l]ike pension systems and seniority, compensation, though often correlated with age, is analytically distinct." *Kelly*, 348 F. App'x at 750 (citing *Hazen Paper*, 507 U.S. at 611). Importantly, the New Jersey Supreme Court has also adopted this principle. *See Sisler*, 723 A.2d at 959 (holding that the "fact that many legitimate reasons for rejecting, terminating or promoting an employee have a strong and natural correlation with age does not render those reasons suspect for purposes of the [NJLAD]"); *see also Young v. Hobart West Group*, 897 A.2d 1063, 1069 (N.J. App. Div. 2005) (holding that an employer did not violate the NJLAD's anti-age discrimination provisions when it terminated the plaintiff as a "cost reduction measure"). Accordingly, Garden's testimony concerning Vitas' cost-saving motivations does not support a colorable NJLAD claim.

Additionally, Garden fails to provide any evidence that Vitas replaced her with a candidate "sufficiently younger to permit an inference of age discrimination," as required for a successful age discrimination claim under the NJLAD. *Sisler*, 723 A.2d at 959. To this effect, Garden offered only her own deposition testimony that "[Vitas was] hiring younger, less experienced [representatives] for less money." (ECF No. 29-3, Ex. C, at 220:22-23.) Garden's contention is undercut not only by her concession that Vitas' motivations may have cost-driven, but also the fact that, at the time of her termination, Vitas employed a representative who was approximately twenty years older than Garden. (ECF No. 27-4, Ex. M, at 76-78.)

In her brief, Garden cites to identical statements from Vitas Representatives Kathleen McElwee and Jessica Agnew (ECF No. 29-1 at 16-27) asserting that Vitas violated company standards and that Garden was "deprived of access" needed to reach her goals. However, these statements may not be considered by this Court. The two statements provided by Garden were signed, but never sworn to before a public notary or other authorized official. (ECF No. 29-3, Ex. B, at 11-14.) It is well settled that even when documents bear the signature of the declarant and two witnesses, such document is not a proper affidavit under Rule 56(e) unless sworn to before a public notary or other authorized official, and thus shall not be considered in a summary judgment motion. *X v. Brierly*, 457 F. Supp. 350, 351 n.1 (E.D. Pa. 1978); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n.17 (1970).

Moreover, even if these statements had been properly sworn to, they still would not constitute evidence creating an inference of age discrimination. Neither statement mentioned Garden's age nor any specifics of her job performance. Rather, the statements merely note that Garden was the "longest serving Vitas Representative" and that Vitas' re-districting disallowed Garden to meet her admissions goals. (ECF No. 29-3, Ex. B, at 11-14.) As discussed, the United States Supreme Court has held that "[a]ge and years of service are analytically distinct" in determining liability under the ADEA, *Hazen Paper*, 507 U.S. at 609-10, and the New Jersey Supreme Court has adopted this reasoning in analyzing cases under the NJLAD. *Sisler*, 723 A.2d at 959.

Finally, even if Garden had offered some competent evidence of discrimination establishing a *prima facie* case under the NJLAD, Vitas proffered a non-discriminatory reason for Garden's termination such that Garden does not qualify for a jury trial. *Zive*, 867 A.2d at 1144. Specifically, Vitas offered a termination memo sent to Garden which provided a detailed outline

of her waning performance. (ECF No. 27-4, Ex. D, at 17-18.) Among other things, this memo notes Garden averaged as low as 3.3 sales calls per day whereas the required minimum was ten calls per day, Garden's failure to pre-populate her sales force calendar, Garden's failure to send the GM her list of scheduled appointments, and Garden's failure to notify the Veterans Liaison of a cancellation. (*Id.*) Garden does not counter Vitas' proofs with any evidence of her own, whether direct or circumstantial, from which a factfinder could either "disbelieve the employer's articulated legitimate reasons" nor "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause" in her termination. *Zive*, 867 A.2d at 1144 (citations omitted).[2]

## V. CONCLUSION

For the reasons set forth above, Vitas' Motion for Summary Judgment (ECF No. 27) is **GRANTED** and Garden's Cross-Motion for Partial Summary Judgment (ECF No. 29) is **DENIED**.

**Date:** October 12, 2018

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**

---

[2] Garden asserts only that the termination memo cited by Vitas constitutes inadmissible hearsay. (ECF No. 29-1 at 17.) On the contrary, the termination memo is a record of a regularly conducted business activity, and as such is admissible pursuant to Federal Rule of Evidence 803(6). The memo was made in Vitas' course of business, transmitted by a party with knowledge of the events, and was published contemporaneously with the events noted therein. Additionally, Garden has failed to show that the memo lacks trustworthiness in some respect.